IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 9, 2019

## STATE OF TENNESSEE v. VICTOR WISE

**Appeal from the Criminal Court for Shelby County**
No. 16-06899    James Lammey, Jr., Judge

### No. W2018-01343-CCA-R3-CD

The defendant, Victor Wise, appeals his Shelby County Circuit Court jury convictions of two counts of aggravated robbery, one count of attempted aggravated robbery, and two counts of aggravated assault, challenging the exclusion of certain evidence, the sufficiency of the convicting evidence, and the propriety of the 44-year effective sentence. We affirm the defendant's convictions but conclude that the trial court erred by imposing consecutive sentences. Accordingly, the defendant's total effective sentence is modified to 12 years.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Larry E. Fitzgerald, Memphis, Tennessee, for the appellant, Trenton Ray Forrester.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jamie Kidd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Shelby County Grand Jury charged the defendant, Aaron Cathey, and Cortavius Macklin, aka Cortavius Grove, with two counts of aggravated robbery, one count of attempted aggravated robbery, and two counts of aggravated assault for their roles in the August 4, 2016 "smash-and-grab" robbery at a Memphis pawn shop.

At the February 2018 trial, Cash America Pawn employee Darnell Smith testified that shortly after the store opened on August 4, 2016, two men entered the store. One man stood at the jewelry case while "the other one was like pacing the floor of the

store." The man who had been pacing the store "pulled a gun out on the manager" and demanded cash. The man who had been standing at the jewelry counter then smashed the glass of the jewelry case with a hammer and began taking jewelry. The men took more than 20 individual pieces of jewelry, approximately $700 cash, and a car "amp" from the store.

Mr. Smith said that he feared for his life during the robbery. He provided a statement to the police and, after viewing two photographic arrays, identified the two men who had entered the store and committed the robbery. The defendant was not one of them.

Cash America Pawn manager Nichole Keys testified that on August 4, 2016, two men entered the store and one of the men pointed a gun at her while the other "proceeded on to break the jewelry cases and pull jewelry out of the cases." She recalled that the man with a gun said, "'You know what this is about.'" She interpreted this statement to "basically" mean that she should "give him all the money out of the registers," and she did so. At one point, the man with the gun pointed it at another customer who was "trying to make us do a transaction for him not realizing that we were being robbed." The man with the gun ordered the customers onto the floor. Ms. Keys pressed the "hold-up alarm" as she was getting the cash from the registers. She said that she was terrified during the robbery.

Ms. Keys testified that the jewelry cases taken during the robbery were equipped with global positioning satellite ("GPS") devices. During the robbery, a total of 118 individual pieces of jewelry with a total value of $24,555 was taken.

Willie Conway was a customer at Cash America Pawn when two men came into the store and "told us to hit the floor - don't look back or they'll bust a cap in our head." Mr. Conway said that one of the men pointed a gun at him and that he feared for his life. The man with the gun took $400 from Mr. Conway.

Ben Berry was also a customer at Cash America Pawn on August 4, 2016, when the store was robbed at gunpoint. Mr. Berry said that a man with a gun "said, 'All right, you all know what time it is; everybody hit the ground.'" Mr. Berry said that he and another customer got on the floor and that he heard breaking glass. Mr. Berry said that he feared for his life. He recalled that the man with the gun tried to take money from him, but he did not have any money on his person at the time.

Memphis Police Department ("MPD") Sergeant Richard Rouse testified that when he heard "the broadcast over the radio about the robbery," he "followed directions on the radio from some tracking of the possible suspect vehicle." He explained

that officers viewing location information from the GPS devices installed on property taken during the robbery relayed that location information over the radio and that he followed those directions onto the interstate and into West Memphis, Arkansas. Sergeant Rouse said that he did not intend "to continue too much into the next state," so he decided "to take the exit and turn around and come back to Memphis." At the end of the off-ramp, Sergeant Rouse saw a blue Nissan Maxima that matched the description of the suspect vehicle. He followed the car.

The blue Nissan pulled into the parking lot of the Greyhound Gaming Casino, which was also known as the Southland Gaming Casino ("the Casino"), and parked. Sergeant Rouse parked a short distance away to observe the vehicle. Shortly thereafter, a message came over the radio that "the vehicle was stopped stationary at the southeast corner" of the Casino. Sergeant Rouse immediately radioed to other officers that he had the vehicle in sight and that there were three occupants. At that point, the driver exited the vehicle and began walking toward the Casino. He described the driver as a black male in his late twenties wearing a white t-shirt, gray "camo pattern" shorts, and particularly distinctive "bright blue shoes."

Surveillance video from outside the Casino captured a man fitting that same description exiting a blue Maxima and entering the Casino. Surveillance video from inside the Casino captured the man coming from what appeared to be the restroom area wearing different pants but the "same blue shoes and same white T-shirt." The man sat down at a slot machine. Officers approached the man and placed him under arrest. Sergeant Rouse identified the defendant as the man who had exited the driver's side of the Maxima, entered the Casino, and changed his clothes while inside.

Officers from the West Memphis Police Department arrived, and Sergeant Rouse flagged them down to explain the situation. At that point, the two occupants of the Maxima got out of the car and began running away. Sergeant Rouse chased one of the men, while an officer of the West Memphis Police Department pursued the other. The man that Sergeant Rouse was chasing, who was later identified as Cortavius Grove, ran into a nearby field, where Sergeant Rouse later located him with assistance from a West Memphis Police Department Canine Unit. The other man, later identified as Aaron Cathey, was also apprehended at the scene.

Officers found the jewelry display cases and jewelry taken from Cash America Pawn inside the blue Maxima along with "piles of money." Officers also discovered "burglary tools," including "sledge hammers, hammers, [and] bolt cutters," and a pistol inside the Maxima.

MPD Sergeant Taurus Nolen testified that he was a member of the Federal Bureau of Investigation Safe Streets Task Force, which was tasked with investigating business and bank robberies in Memphis. He stated that the GPS tracking system associated with the devices placed on the items taken from Cash America Pawn was "live-wired" so that "every time it goes off, we get a ping on our phones." Sergeant Nolen "tracked the pings, live time," and "[t]hey ended up at a point of rest at" the Casino. Sergeant Nolen and other Task Force members traveled to the Casino, and they made the decision to transport all three suspects to the West Memphis Police Department to be interviewed.

Sergeant Nolen interviewed co-defendant Aaron Cathey, whom he described as "very smart" looking. Mr. Cathey told Sergeant Nolen that he and Mr. Grove entered Cash America Pawn and that he demanded money at gunpoint while Mr. Grove "smashed the display cases and took jewelry." He said that the gun, which was actually a BB gun, had been given to him by the defendant, who had acted as a lookout and getaway driver. After robbing the store, Mr. Cathey and Mr. Grove ran into an abandoned house, where they changed clothes before getting into the car with the defendant. The defendant drove them to the Casino, where they had planned to get something to eat. Mr. Cathey identified the defendant and Mr. Grove from two separate photographic arrays and wrote on the defendant's photo, "'He also planned it and sent me and Tave in.'"

Mr. Cathey testified that the defendant texted him early on the morning of August 4, 2016, and asked him to "[d]o a smash and grab" at Cash America Pawn. Mr. Cathey agreed to participate, and the defendant and Mr. Grove picked him up a short time later. They drove around briefly "[t]o scope out the scene" before parking "on the east side of McLemore" to await the store's opening. Mr. Cathey said that the defendant provided him with a BB gun and told him to pull the gun when he heard Mr. Grove smash the glass. Mr. Cathey stated that all three men were to get a share of the proceeds of the robbery.

Shortly after the store opened, Mr. Cathey, armed with the BB gun, and Mr. Grove, armed with a hammer, entered and began executing their plan. Mr. Grove smashed the display case with a hammer, and Mr. Cathey "raised the gun and . . . told 'em, 'You all know what it is - everybody get down.'" Mr. Cathey took the cash while Mr. Grove took the merchandise. After the robbery, Mr. Cathey and Mr. Grove "[r]an on the backside and went to James Street. Ran into an abandoned house and disregarding our clothes that we had on." They then called the defendant to pick them up, and the three men fled in Mr. Grove's blue Nissan Maxima "down Walker headed towards East Crump." They traveled to the Casino, and the police arrived shortly thereafter.

During cross-examination, Mr. Cathey testified that he had not been given any consideration in exchange for his testifying against the defendant. He said that the robbery plan was "just to go in and snatch the jewelry" and not to take the cash from the customers. He admitted that he made the decision to take cash from the customers.

The defendant elected not to testify and did not present any proof.[1]

Based upon this evidence, the jury convicted the defendant as charged. Following a sentencing hearing, the trial court imposed sentences of 12 years for both of the defendant's convictions of aggravated robbery and sentences of 10 years each for the defendant's convictions of attempted aggravated robbery and aggravated assault. The trial court merged the defendant's convictions for the aggravated assault and attempted aggravated robbery of Mr. Berry into a single conviction. The court ordered consecutive sentencing for a total effective sentence of 44 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, he challenges the exclusion of testimony from Jailer Jaquana Crutcher, the sufficiency of the convicting evidence, and the propriety of the 44-year effective sentence.

## I. Excluded Testimony

The defendant asserts that the trial court erred by excluding the testimony of Jailer Jaquana Crutcher, arguing that the court abused its discretion by concluding that her proffered testimony was irrelevant. The State contends that the ruling was proper.

After the State closed its case-in-chief, the defendant attempted to call Jailer Jaquana Crutcher. The State objected on grounds that Ms. Crutcher had no relevant testimony to offer. The trial court permitted the parties to question the witness out of the presence of the jury before making its ruling. During that questioning, Ms. Crutcher said that she overheard Mr. Cathey say that he had been at Cash America Pawn and then "say something about the dog track" as she "was doing [her] round." She said that she never heard Mr. Cathey mention the defendant's name and that he only talked about himself during the conversation she overheard.

The trial court ruled that Ms. Crutcher's testimony was irrelevant. The court noted that, had the witness testified that she overheard Mr. Cathey say that the defendant had not been involved in the robbery, that testimony would certainly have been

_____

[1] The defendant attempted to call Jailer Jaquana Crutcher to testify about a statement that she overheard Mr. Cathey make at the jail, but the trial court deemed her testimony irrelevant. The exclusion of her testimony is one of the issues presented in this appeal.

admissible. The court also concluded that Ms. Crutcher's proposed testimony did not impeach that offered by Mr. Cathey.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

That Ms. Crutcher overheard Mr. Cathey mention Cash America Pawn and "say something about the dog track," when he made no mention at all of the defendant, did not make any fact of consequence at the defendant's trial more or less probable. The question presented was whether the defendant was a participant in the robbery of Cash America Pawn. Nothing in Ms. Crutcher's proffered testimony had any bearing on that inquiry. In consequence, the trial court did not err by excluding it.

## *II. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that his convictions were improperly based "mainly" on the testimony of Mr. Cathey.[2] The State asserts that the evidence was sufficient to support the convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d

---

[2] The defendant also seems to suggest that the exclusion of Ms. Crutcher's testimony gave rise to reasonable doubt about the defendant's participation, stating, "If the court had allowed Deputy Jailor to testify about the co-defendants discussing the robbery, perhaps the testimony could have shed more light on the subject." The record establishes, however, that the trial court allowed the parties to question Ms. Crutcher before making a determination about the admissibility of her testimony.

370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery "is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be." *Id.* § 39-12-101(a)(1).

A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon." *Id.* § 39-13-102(a)(1)(A)(iii). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

In this case, the defendant was convicted under a theory that he was criminally responsible for the actions of Mr. Cathey and Mr. Grove. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). As charged here, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("[C]riminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

It is well settled "that a conviction may not be based solely upon the

uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). Indeed, "[w]hen the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts*, 379 S.W.2d at 43).

To be sure, Mr. Cathey was an accomplice to all the charged offenses. That being said, his testimony was sufficiently corroborated by other evidence in the record.

The evidence adduced at trial established that Mr. Cathey and Mr. Grove walked into Cash America Pawn on the morning of August 4, 2016, and robbed the store of cash and jewelry and stole cash from two store patrons at gunpoint. Mr. Cathey testified that the defendant texted him that morning and asked him to participate in a "smash and grab" robbery at the store with Mr. Grove. Mr. Cathey agreed, and the defendant and Mr. Grove picked Mr. Cathey up in Mr. Grove's blue Nissan Maxima. The defendant drove Mr. Cathey and Mr. Grove to the area near Cash America Pawn, and, after driving around to survey the area, he dropped Mr. Cathey and Mr. Grove off at the store. Mr. Cathey was armed with a BB gun given to him by the defendant, and Mr. Grove was armed with a hammer. Mr. Cathey pointed the BB gun at Ms. Keys and demanded money from the register while Mr. Grove smashed the glass of the jewelry display case with a hammer and began loading jewelry into a bag. At one point, Mr. Cathey turned the gun upon the customers present and demanded cash. Mr. Conway gave him some $400, but Mr. Berry had no cash to give. Mr. Berry, Ms. Keys, Mr. Conway, and Mr. Smith all testified that they feared that they would be shot or killed during the robbery.

After the robbery, Mr. Cathey and Mr. Grove ran into a nearby abandoned house, where they changed clothes and telephoned the defendant to pick them up. The defendant arrived and then drove the men to the Casino, where they intended to eat and divvy up the proceeds. Unbeknownst to the perpetrators, the jewelry cases taken during the robbery were equipped with GPS trackers that allowed the police to track their movements from Cash America Pawn to the Casino. Sergeant Rouse, who was tracking the Maxima's movements, eventually ended up behind the car. He parked nearby at the Casino and kept the car under constant surveillance while he awaited backup. He watched the defendant exit the driver's seat and enter the Casino. The defendant changed clothes while inside the Casino. Video surveillance from inside the Casino made it possible to track the defendant's movements from the time he entered the facility until his arrest a few minutes later. The jewelry and cash was found in the car the defendant was driving.

In our view, this evidence was more than sufficient to support each of the defendant's convictions.

### III. Sentencing

The defendant asserts that the trial court erred by imposing a total effective sentence of 44 years' incarceration, arguing that "[h]is role did not mandate consecutive sentences."

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). The standard of review adopted in Bise "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *See State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995); *State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

At the sentencing hearing, the State asked the trial court to merge the defendant's convictions of the attempted aggravated robbery and aggravated assault of Mr. Berry but asked the court to impose consecutive terms for the remaining convictions. The defendant argued that consecutive sentences were not warranted under the circumstances.

Here, the trial court enhanced the length of each of the defendant's Range I sentences upon determining that the defendant had a history of criminal convictions or criminal behavior in addition to that necessary to establish his sentencing range, *see* T.C.A. § 40-35-114(1); that the defendant was a leader in the commission of the offenses, *see id.* § 40-35-114(2); that the offenses involved more than one victim, *see id.* § 40-35-114(3); that the amount of property taken was particularly great, *see id.* § 40-35-114(6); that the defendant had failed to comply with a sentence involving release into the community, *see id.* § 40-35-114(8); that the defendant had no hesitation about committing the crime despite the high risk to human life, *see id.* § 40-35-114(10); and that the defendant committed an offense as a juvenile that would have been classified as a felony if committed by an adult, *see id.* § 40-35-114(16). The court gave very little weight to enhancement factors three, six, eight, and 10 but gave great weight to factors one, two, and 16. The trial court imposed the maximum within-range sentence for each

of the defendant's convictions.

The trial court concluded that consecutive sentences were warranted in this case because the defendant was an offender with an extensive record of criminal activity. The court observed that the defendant was in and out of the juvenile system from the age of 14, that he continued to engage in criminal activity after reaching the age of majority, and that he had held only a single, verifiable job in his entire life. The court also found that the defendant was a dangerous offender, observing that the circumstances of the offense were exaggerated by the fact that the defendant did not actually enter the store but "let other people do his dirty work" and that the aggregate sentence reasonably related to the severity of the offenses. As to the latter finding, the court found that concurrent sentencing would allow the defendant "to have two violent crimes for the price of one - or three - or four for the price of one." The court merged counts three and four and ordered that the sentences for the remaining counts be served consecutively to one another for a total effective sentence of 44 years' incarceration.

As an initial matter, we note that none of the exhibits from the sentencing hearing were included in the record on appeal. In the absence of the presentence report and certified records examined by the trial court during the hearing, we must presume that the determinations of the trial court regarding the defendant's criminal record are correct.

That being said, the record does not support the trial court's conclusion that the defendant had an extensive record of criminal activity that would justify the imposition of consecutive sentences. According to the trial court, the defendant had several "encounters" with the criminal justice system as a juvenile. *See State v. Stockton*, 733 S.W.2d 111, 112-13 (Tenn. Crim. App. 1986) (observing that "a juvenile record of criminal conduct may properly be considered in assessing a suitable sentence upon a felony conviction by an adult"). Despite being 30 years old, however, the defendant had only two felony adult convictions for relatively minor offenses. Although the defendant stated in the presentence report that he had led a "life of crime," he did so in the context of discussing his family history. Moreover, although the trial court pointed out that the defendant had no verifiable employment history, it did not find that the defendant was "a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). Finally, the trial court failed to make the appropriate findings to impose consecutive sentences based upon the defendant's being a dangerous offender. *See Pollard*, 432 S.W.3d at 863 ("The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated [the *Wilkerson*] requirement."). The trial court specifically failed to find that consecutive sentences were necessary to protect the public from further criminal conduct. *See Wilkerson*, 905 S.W.2d at 937-39. In its finding that consecutive sentences

-11-

reasonably related to the severity of the offenses committed, the trial court focused on its own opinion that the imposition of concurrent sentences would allow the defendant "to have two violent crimes for the price of one - or three - or four for the price of one" instead of focusing on the severity of the crimes actually committed. *See id.* Although we have no doubt the victims experienced fear during the robberies, the smash-and-grab robbery was not even committed with an actual firearm. Although Mr. Grove was carrying a hammer, there was no proof that he used it for anything other than smashing the glass jewelry case. The trial court made much of the fact that the defendant "let others do his dirty work," but the evidence adduced at trial established that Mr. Cathey willingly agreed to participate in the robbery when asked to do so by the defendant. There was no proof that the defendant forced either Mr. Cathey or Mr. Grove to enter Cash America Pawn and commit the offenses therein. Indeed, Mr. Cathey testified that he alone elected to take money from the other customers in the store, which action led to all but one of the conviction offenses. The record also established that no one was injured, and the offenders were apprehended in short order.

Under these circumstances, it is our view that the record does not support the imposition of consecutive sentences. Accordingly, we reverse the imposition of consecutive sentences and remand the case for the entry of judgments reflecting concurrent alignment of all the sentences. The new effective sentence is, therefore, 12 years.

## *IV. Conclusion*

Based upon the foregoing analysis, we affirm the defendant's convictions but reverse the imposition of consecutive sentences. The case is remanded for the entry of judgment reflecting the newly modified sentences.

_____
JAMES CURWOOD WITT, JR., JUDGE

-12-